# Exhibit A

# EXHIBIT A

## AFFIDAVIT OF SPECIAL AGENT CASEY ANDERSON IN SUPPORT OF A COMPLAINT FOR CIVIL FORFEITURE

I, Special Agent Casey Anderson, state the following:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since September of 2019. I am assigned to the Bangor, Maine (ME) Resident Agency of the FBI, Boston Division, where I am responsible for conducting federal criminal investigations related to wire fraud, white collar crime, violent crimes, and online crimes. My participation in these types of investigations has included utilizing confidential informants and cooperating witnesses; coordinating and conducting the execution of search and arrest warrants; performing victim and witness interviews; reviewing communication records and content; and conducting electronic and physical surveillance. Since May of 2023, I have been responsible for conducting investigations into fraud and theft involving cryptocurrency transactions. I am certified in the use of blockchain analysis programs and methods, the fundamentals of cryptocurrency and blockchain transactions, and advanced methods of analysis of transactions on the Bitcoin blockchain and the Ethereum Blockchain.

## PURPOSE OF AFFIDAVIT

2. This affidavit is submitted in support of a Verified Complaint for Forfeiture *in Rem* against the following Tether ("USDT"):[1]

[1] "USDT" is the abbreviation for Tether, a form of cryptocurrency whose tokens operate as a stablecoin, indicating that each token is equivalent in value to one U.S. dollar.

a. Approximately 47,461.73111 USDT associated with the cryptocurrency wallet with the address 0x1ea3eb07180e408d2742821AA7D94f6c06064fCD (the "Defendant Property").[2]

3. As set forth below, there is probable cause to believe that the Defendant Property is proceeds and funds laundered in connection with a sophisticated cryptocurrency tech support scheme targeting at least one Massachusetts victim. Therefore, the United States has probable cause to believe that the Defendant Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) because it represents property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, or conspiracy to commit a specified unlawful activity, specifically violations of 18 U.S.C. § 1343 (wire fraud or conspiracy to commit wire fraud). There is also probable cause to believe that the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it represents property, real or personal, involved in a transaction or attempted transaction, specifically violations of 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering) or property traceable to such property.

4. Tether voluntarily froze the wallet address at the request of law enforcement. Frozen wallets may receive funds, but they cannot transfer any funds in or out.

5. The Defendant Property was seized pursuant to a seizure warrant issued in the District of Massachusetts on March 3, 2026. To seize the applicable USDT, Tether Limited will "burn" (*i.e.*, destroy) the USDT tokens currently associated with the cryptocurrency wallet and reissue the equivalent amount of USDT tokens and transfer that equivalent amount to a

[2] The wallet with the address 0x1ea3eb07180e408d2742821AA7D94f6c06064fCD is referred to in this affidavit as the "Target Wallet" while the USDT associated with it is the Defendant Property.

government-controlled cryptocurrency wallet. In accordance with this process, Tether transferred the Defendant Property to a U.S. government-controlled wallet on July 20, 2026.

6. The facts in this affidavit come from my personal knowledge, my training and experience, a review of relevant records, information obtained from law enforcement personnel and witnesses, and publicly available information. Because this affidavit is being submitted for the limited purpose of establishing probable cause for the forfeiture of the Defendant Property, it does not contain every fact known to me or other law enforcement personnel participating in this investigation.

## STATUTORY AUTHORITY

7. As set forth below, there is probable cause to believe that the Defendant Property is proceeds obtained through violations of 18 U.S.C. § 1343 (wire fraud), conspiracy to commit wire fraud, and 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering).

8. Pursuant to 18 U.S.C. § 981(a)(1)(C), property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, or conspiracy to commit a specific unlawful activity, specifically violations of 18 U.S.C. § 1343 (wire fraud), is subject to civil forfeiture. Pursuant to 18 U.S.C. § 1961(1), as incorporated by 18 U.S.C. § 1956(c)(7)(A), violations of 18 U.S.C. § 1343 are a "specified unlawful activity" within the meaning of 18 U.S.C. § 981(a)(1)(C).

9. It is a violation of 18 U.S.C. § 1343 for a person to devise or intend to devise a scheme or artifice to defraud, for obtaining money or property, by means of false or fraudulent pretenses, representations, or promises, to transmit or cause to be transmitted by means of wire communication in interstate commerce, writings, signs, signals, pictures, or sounds for the purpose of executing the scheme to defraud.

10. Pursuant to 18 U.S.C. § 981(a)(1)(A), property, real or personal, involved in a transaction or attempted transaction, in violation of 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering), or property traceable to such property, is subject to civil forfeiture.

11. It is a violation of 18 U.S.C. § 1956(a)(1)(B)(i) (laundering of monetary instruments) to conduct or attempt to conduct a financial transaction knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of a specified unlawful activity.

12. It is a violation of 18 U.S.C. § 1956(h) to conspire to engage in the offense of money laundering.

**BACKGROUND ON CRYPTOCURRENCY**

13. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency[3] to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Examples of cryptocurrency are Bitcoin, Litecoin, and Ethereum. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a

[3] Fiat currency, such as the U.S. dollar, is backed by a government, but not by a physical commodity such as gold.

decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction.[4] Cryptocurrency is not illegal in the United States.

14. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key"). A public address is represented as a case-sensitive string of letters and numbers, 26–36 characters long. Each public address is controlled and/or accessed using a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

15. Bitcoin[5] is one type of virtual currency, circulated over the Internet as a form of value. While bitcoin exists primarily as an Internet-based form of currency, it is possible to "print out" the necessary information and exchange bitcoin via physical medium.

16. To transfer bitcoin to another address, the payor transmits a transaction announcement, cryptographically signed with the payor's private key, across the peer-to-peer

---

[4] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[5] Since Bitcoin is both a currency and a protocol, capitalization differs. Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the currency. That practice is adopted here

Bitcoin network. The Bitcoin address of the receiving party and the sender's private key are the only pieces of information needed to complete the transaction. These two keys by themselves rarely reflect any identifying information. As a result, little-to-no personally identifiable information about the payor or payee is transmitted in a Bitcoin transaction itself. Once the payor's transaction announcement is verified, the transaction is added to the blockchain, a decentralized public ledger that records all Bitcoin transactions. The blockchain logs every Bitcoin address that has ever received a bitcoin and maintains records of every transaction for each Bitcoin address. Different blockchains exist for different currencies and currency types.

17. To acquire bitcoin, a typical user will purchase them from a Bitcoin "exchanger."[6] Bitcoin exchangers generally accept payments of fiat currency (currency that derives its value from government regulation or law), or other convertible virtual currencies.

18. There are many forms of exchangers, including online virtual currency exchanges, and cryptocurrency automatic teller machines (ATMs) that allow users to make cash deposits and convert the deposited funds to a designated cryptocurrency, then transfer the funds to a specified wallet, minus a fee. Bitcoin Depot is a company that operates a Bitcoin ATM network.

19. The information above outlines processes related to the Bitcoin blockchain and the associated financial ecosystem, however, also relevant is the Ethereum blockchain and financial ecosystem. The Ethereum ecosystem is designed to allow executable code to be exchanged on the blockchain in the form of Smart Contracts. Smart Contracts are self-executing, programmable scripts stored on the blockchain that automatically enforce, verify, or execute contract terms when

---

[6] It is also possible to earn bitcoin by verifying other users' transactions, a process known as "mining."

predefined conditions are met. These contracts allow for secure, decentralized, and efficient transactions between parties without requiring a trusted third party.

20. Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different virtual currency. For example, USDT is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives. Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (*i.e.*, the funds held in reserve) for USDT tokens.

21. Although cryptocurrencies such as Bitcoin, Ether, and Tether have legitimate uses, like fiat currencies, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track transactions.

## BASIS FOR FORFEITURE

### The Conspiracy to Defraud and Launder Fraud Proceeds

22. As described more fully below, law enforcement identified victims of a sophisticated tech support scam, including one victim in Massachusetts. Several of the victims received popup error messages on their computers that directed them to contact Microsoft tech support at a specific telephone number, which was actually controlled by fraudsters. After the fraudsters engaged with several of the victims, the victims were directed by fraudsters to deposit cash in a cryptocurrency ATM, where it was subsequently converted to cryptocurrency and transferred to other cryptocurrency wallets, and exchanged through a cross-chain bridge and currency swap service. Law enforcement was able to trace some of the fraud proceeds to the Target Wallet.

*Victim 1*

23. On August 8, 2025, Victim 1, a resident of Ware, Massachusetts, reported to law enforcement that she had been the victim of an online fraud, and, at the direction of the perpetrators of the fraud, had deposited $15,950.00 into a Bitcoin ATM at a gas station in Ludlow, Massachusetts. Victim 1 indicated that her home computer became unresponsive and a pop-up window appeared on her screen that looked to be from Microsoft. The pop-up window included a customer support telephone number.

24. Victim 1's husband called the telephone number listed and an individual who claimed to be a Microsoft customer service representative, informed him that the computer had been "compromised" and directed Victim 1's husband to download a third-party application via a link provided. The individual also informed Victim 1 and her husband that their bank account had "unauthorized withdrawals" related to purchase of child pornography, a claim that I believe to be false.

25. Victim 1 checked her bank account and noticed no funds were missing, but the fraud perpetrators directed her to "protect" her money by withdrawing funds and sending them to a "government" account for safekeeping. The fraud perpetrators also told Victim 1 that the bank would refund the money when the investigation was complete, but that bank personnel should not be notified and should not be trusted. As a result, Victim 1 withdrew funds from her bank account and did not disclose to the bank teller when asked if she was being influenced to withdraw the funds.

26. The fraud perpetrators then directed Victim 1 to make a bitcoin deposit by going to a Bitcoin Depot brand cryptocurrency ATM, creating a bitcoin account, and depositing the funds she withdrew from her bank account into a cryptocurrency ATM.

27. Victim 1 deposited $15,950.00 into a Bitcoin Depot cryptocurrency ATM in Ludlow, Massachusetts. The deposit resulted in 0.09653399 Bitcoin (BTC) worth approximately $11,249.43 USD being transferred to a cryptocurrency address on the Bitcoin blockchain ("Transaction 1").

28. The receipt provided by Victim 1 showed the BTC was transferred to address bc1qqyfn3wvwxzvzrhzn0jx03wgpckrsueswzkjzjn. Through cryptocurrency tracing, discussed in more detail below, investigators located funds from Transaction 1 in the Target Wallet (0x1ea3eb07180e408d2742821AA7D94f6c06064fCD). Investigators identified the other 4 deposits into this wallet as other deposits made to Bitcoin Depot ATMs.

29. Law enforcement obtained records from Bitcoin Depot about other transactions that led to deposits into the Target Wallet, and identified 4 additional customers who deposited funds into Bitcoin Depot ATMs that were eventually transferred to the Target Wallet.

*Victim 2*

30. Victim 2 is a resident of Nashua, New Hampshire. Victim 2 reported that he was contacted in June 2025 by someone who represented themselves as an employee of Bank of America. Victim 2 described a similar, but not identical, fraud scheme as described by Victim 1.

31. On June 17, 2025, fraud perpetrators directed Victim 2 to transfer money out of his checking account in order to prevent account "compromise," and to deposit the funds into a cryptocurrency ATM. Victim 2 complied with the instructions and withdrew $15,000 from his checking account and deposited $14,900 of the funds into a cryptocurrency ATM at a gas station in Nashua, New Hampshire, and later deposited an additional $17,350 into the same cryptocurrency ATM. Victim 2 moved the money at the direction of an individual that he believed worked for Bank of America.

32. Information provided by Bitcoin Depot showed one transaction on June 17, 2025, to bc1qdajg0502vcc54qrylquahlqtusl7dg98zelq7g ("Transaction 2"). In this transaction, $17,350 was deposited into the cryptocurrency ATM, which resulted in a transfer of .11666696 BTC then worth approximately $12,220.

*Victim 3*

33. Victim 3 is a resident of Prescott, Arizona. In June 2025, Victim 3 reported receiving a popup error message on her computer that directed her to contact Microsoft tech support at a specific telephone number. In her conversations with individuals whom she believed to be representatives of Microsoft and customer service at the bank where she has accounts, Victim 3 was also told her bank accounts were "compromised." The fraud perpetrators instructed Victim 3 to withdraw funds from her bank and deposit them into a cryptocurrency ATM. As a result, Victim 3 withdrew $7,850 from her bank account and deposited it into a cryptocurrency ATM.

*Victim 4*

34. Victim 4 is a resident of Orting, Washington. Victim 4 spoke with investigators from the Orting Washington Police Department on August 20, 2025. Like Victims 1 and 3, Victim 4 received a popup error message on her computer that directed her to contact Microsoft tech support at a specific telephone number. In conversations with individuals whom she believed to be representatives of Microsoft and customer service at the bank where she has accounts, Victim 4 was told that her bank accounts were "compromised" that she was "under investigation," that because the "compromise" was related to people at her bank, she should not contact her bank.

35. The fraud perpetrators directed Victim 4 to withdraw funds from her bank account and deposit them in a Bitcoin Depot cryptocurrency ATM. In total, Victim 4 deposited approximately $78,000 into the cryptocurrency ATM, in multiple deposits.

*Victim 5*

36. Victim 5 is a resident of New Caney, Texas. Victim 5 stated that she was the victim of fraud, and as a result deposited approximately $15,000 in a cryptocurrency ATM on or around June 23, 2025.

37. Based on my training and experience, I know that cryptocurrency fraud conspiracies often involve the use of malware, fraudsters acting as customer support employees or law enforcement, threats of compromised accounts, and demands for payments in order to protect funds from "compromise," government seizure, or as a payment for fabricated crimes.

**Tracing Fraud Proceeds and Money Laundering Activity**

38. Blockchain analysis is a method used to trace the sources and destinations of cryptocurrency transactions and the implementation of smart contracts. While the identity of a virtual currency address owner is generally anonymous, law enforcement can identify the owner of a particular virtual currency address by analyzing the blockchain (*e.g.*, the BTC blockchain). The analysis can also reveal additional addresses controlled by the same individual or entity. "For example, when an organization creates multiple [BTC] addresses, it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history. Open source tools and private software products can be used to analyze a transaction."[7]

39. In addition to using publicly-available blockchain explorers, law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions. These companies analyze virtual currency blockchains and attempt

[7] *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

to identify the individuals or groups involved in transactions. Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

40. Using proprietary software, open-source information, and blockchain analysis, I traced funds deposited into the Bitcoin ATMs by Victim 1 and Victim 2, through numerous cryptocurrency addresses, to the Target Wallet. Additionally, I traced the source of funds for all deposits in the Target Wallet and identified that the source of all the USDT in the Target Wallet are transactions from Bitcoin Depot ATMs that can be identified as deposits from the victims of this fraud scheme.

41. The information identified by the blockchain analysis is consistent with the records produced by Bitcoin Depot and information provided by the victims. In each case, victim funds deposited into a Bitcoin Depot ATM and converted to bitcoin which, minus fees, was transferred to an address on the Bitcoin Blockchain. From there, the bitcoin was transferred to the decentralized cross-chain bridge and currency swap service, Chainflip.io.[8]

42. One tool that assists criminals with the obfuscation of sources and destinations of funds is referred to as cross-chain bridges, or blockchain bridges. It is a software application that enables the transfer of digital assets, like cryptocurrency, across different blockchains. Blockchain bridges will often lock or burn coins or tokens on the initial blockchain, and then create a synthetic derivative that represents the locked or burned coin or token on the receiving blockchain. Blockchain bridges are either unidirectional (*i.e.*, can only transfer digital assets to target

[8] The application Chainflip.io allows users to connect a cryptocurrency wallet and transfer funds to the service from a specific virtual currency, like bitcoin. The user also enters a recipient address on a separate blockchain, and once a transfer to the service is made, the designated recipient address receives an equivalent amount of funds in the designated recipient address in a specific virtual currency.

blockchains) or are bidirectional (*i.e.*, allow for the conversion of assets back and forth across blockchains).

43. Following the transfer of funds from each deposit to address controlled by Chainflip.io, funds were bridged to the Ethereum Blockchain using USDT currency, where they were transferred to at least one intermediary address, before being transferred to the Target Wallet, as detailed below.

*Funds from Victim 1*

44. Victim 1 provided the receipt for Transaction 1, as described above. Blockchain analysis identified the transfer of funds from Bitcoin Depot to the cross-chain bridge service Chainflip.io. with the input of currency worth $11,338.81 on the Bitcoin blockchain. The output was identified on the Ethereum blockchain where funds were transferred to the Target Wallet.

45. In the below visual representation of the transactions, each unattributed address is represented by the first 7 characters in its name and addresses associated with clusters of known services are represented by the name of the service:




*Funds from Victim 2*

46. Investigators determined that Victim 2's deposited funds were transferred to a recipient address from a Bitcoin Depot ATM, Transaction 2, as described above.

47. A blockchain analysis identified the transfer of funds from Bitcoin Depot to the cross-chain bridge service Chainflip.io.

48. Unlike the tracing for Transaction 1, here blockchain analysis did not associate the recipient address to Chainflip.io. Based on my training and experience, however, I determined through cluster associations with numerous other wallets and bc1pjesywe0pu55ftga0v6gduhfzlwc832u02as4e8yjx2c8lqweqpeq2nd2pg ("c1pjesy") that the activity in these recipient wallets showed consistent patterns of consolidating funds and transferring them to addresses that were clustered to Chainflip.io. Additionally, there are no transactions out of c1pjesy. The repeated merging of funds that were then transferred to addresses controlled by Chainflip.io by addresses clustered with bc1pjesy, and the lack of funds transfers out of c1pjesy is consistent with the conclusion that c1pjesy is controlled by Chainflip.io and acts as an address in which currency is "locked" or maintained as collateral for currency swapping transactions.

49. The pattern of transactions signifies the initiation of a cross-chain bridge at Chainflip.io with the input of currency worth $13,765.65 USD on the Bitcoin blockchain. The output was identified on the Ethereum blockchain where funds were transferred to the Target Wallet.

50. As described above, these transactions are consistent with cross-chain bridges. A visual representation of the transactions is as follows:




*Funds from Victim 3*

51. Although Victim 3 did not have a transaction receipt, a source of funds analysis was used to identify transactions that resulted in transfers into the Target Wallet. Documents provided by Bitcoin Depot confirmed the transaction number for Victim 3's deposit. As with the other victims, blockchain analysis identified the transfer of funds from Bitcoin Depot to the cross-chain bridge service Chainflip.io.

52. Additional transactions were identified that show funds were merged with other inputs, that led to a withdrawal from Binance.com. The pattern of transactions shows that bc1ppgqfg6e0cv3lvxrxj9uxrj86w37t8lrxrwn2mjdawryt4lr5j3qslgpzga is likely an address associated with a cluster controlled by Chainflip.io and that transaction 5456d2fb353447c9af9c2fb6ebd3cb7adafa9cb72cc811850a5911ef83732dc5, listed above, signifies the initiation of a cross-chain bridge at Chainflip.io with the input of currency worth $5,718.15 USD on the Bitcoin blockchain. The output was identified on the Ethereum blockchain. From this, approximately 2,000.55 USDT traceable to Victim 3 was transferred to the Target Wallet.

53. The remaining 3,668.13 USDT were transferred to an address associated with a private wallet using the Trust Wallet noncustodial service in transaction 0xe0a01bf1dac288f99c2d99fa3ade003316d9839f0b954c61e353aba7a8d5eae0.

54. These transactions are consistent with cross-chain bridges. A visual representation of the transactions is as follows:




*Funds from Victim 4*

55. Victim 4's transactions, as reported to law enforcement, were corroborated by documents produced by Bitcoin Depot. As with the other victims, blockchain analysis identified the transfer of funds from Bitcoin Depot to the cross-chain bridge service Chainflip.io. Additional transactions show that funds were merged with other transfers into addresses controlled by Chainflip.io, which signifies the initiation of a cross-chain bridge at Chainflip.io with the input of currency worth $9,886.24 USD on the Bitcoin blockchain. The output was identified on the Ethereum blockchain where approximately 8900.10 USDT was transferred to the Target Wallet.

56. A visual representation of the transactions is as follows:




*Funds from Victim 5*

57. Victim 5's transactions, as reported to law enforcement, were corroborated by documents provided by Bitcoin Depot. These documents confirmed the transaction numbers for funds deposited by Victim 5. As with the other victims, blockchain analysis identified the transfer of funds from Bitcoin Depot to the cross-chain bridge service Chainflip.io. In additional transactions, the funds were merged with other inputs in addresses controlled by Chainflip.io, which signifies the initiation of a cross-chain bridge at Chainflip.io with the input of currency worth $11,930.91 on the Bitcoin blockchain. The output was identified on the Ethereum blockchain where approximately 11,773.35 USDT of the funds were transferred to the Target Wallet.

58. These transactions are consistent with cross-chain bridges. A visual representation of the transactions is as follows:




59. Based on the analysis above, in addition to being traceable to fraud proceeds, there is probable cause to believe the Defendant Property is property involved in money laundering. Based on my training and experience, I am aware that fraudsters and money launderers will often use intermediary hops or transfers to intermediary wallets to try to obscure the source of the funds and make tracing the transfers of funds more difficult. I am also aware that fraudsters and money launderers often use decentralized exchanges that do not require "know your customer" documentation to change the form of cryptocurrency. In addition, based on my training and experience, I am aware that fraudsters and money launderers will often transfer funds to stable coins such as USDT to avoid market volatility of other forms of cryptocurrency, such as bitcoin.

**CONCLUSION**

60. Based on the previously described information, records, and blockchain analysis, I respectfully submit that there is probable cause to believe that the Defendant Property is subject to

forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), because it represents property, real or personal, which constitutes or is derived from proceeds traceable to a violation of a specified unlawful activity, or conspiracy to commit a specified unlawful activity, specifically violations of 18 U.S.C. § 1343 (wire fraud or conspiracy to commit wire fraud). There is also probable cause to believe that the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it represents property, real or personal, involved in a transaction or attempted transaction, specifically violations of 18 U.S.C. § 1956 (money laundering and conspiracy to commit money laundering) or property traceable to such property.

Pursuant to 28 U.S.C. § 1746, I declare under penalties of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed this 30 day of July, 2026.

Respectfully submitted,

CASEY ANDERSON
Special Agent
Federal Bureau of Investigation